LOUIS SALIEM *vs.* BENJAMIN GLOVSKY AND HARRY E. FOGG.

Oxford.     Opinion, April 4, 1934.

*Albert Beliveau*, for plaintiff.
*Benjamin L. Berman*,
*David V. Berman*, for defendants.

SITTING: PATTANGALL, C. J., DUNN, STURGIS, BARNES, THAXTER, HUDSON, JJ.

HUDSON, J.    Action on the case for abuse of legal process. Defendants move to set aside the plaintiff's verdict for $250.00 because they assert it is against law and evidence and damages recovered are excessive.

Chronologically stated, the credible facts are (no evidence in defense was offered) that on September 2, 1932, the plaintiff, then indebted to the Bell Tire Company in the sum of $33.65 for tires and tubes, operated a small grocery store in the town of Rumford. Late afternoon of this day, these defendants, in behalf of said .

Company, went to the office of a reputable attorney in Rumford and there had him make a common attachment writ on said claim, returnable to the Rumford Municipal Court on the fourth Tuesday of that month. By the writ the officer (Deputy Sheriff Roderick) was commanded "to attach the goods and estate" of Mr. Saliem "to the value of seventy dollars ($70.00)." The attorney, testifying as to the conversation in his office, participated in by the officer, both defendants, and himself, said: "They" (meaning defendants) "explained the situation to Mr. Roderick, what they wanted to do. . . . They said they wanted to attach the store of Mr. Saliem and put in a keeper and take all the money they could get and then get out:" and that he, the attorney, then informed them that he "didn't think it was the proper thing to do and didn't think it was legal. Wouldn't advise it," whereupon "Glovsky said he had been doing that sort of thing and getting away with it and he considered it legal."

Immediately thereafter, Glovsky alone appeared in the plaintiff's store, represented that he had a camp at the lake, and proceeded to purchase a bill of merchandise which he said he wanted to buy at a discount because he desired to re-sell the same. The plaintiff gave Glovsky his requested discount, the goods bought amounting to $16.17. This sale was in accordance with the plan proposed in the law office, for there, according to the testimony of the Deputy Sheriff, Glovsky "said he would go in and do the buying until he bought enough, and he came out and gave me" (meaning the Deputy Sheriff) "the signal before he turned the money over to Saliem, and I was to put Mr. Fogg in as keeper." Then, Glovsky's purchase made but not paid for, upon notice, Defendant Fogg and Deputy Sheriff Roderick came into the store, when the attachment was made. Glovsky requested the officer to put Fogg in as keeper, and he did. The officer took from Saliem the only key to the store and gave it to the keeper. The property attached was all of the plaintiff's stock and fixtures in the store, said merchandise in value being between $400.00 and $500.00, and the fixtures between $500.00 and $600.00, unencumbered except as to a small mortgage on a Frigidaire. At the time of the attachment, seven-thirty in the evening, the plaintiff remonstrated and told the officer that he did not think that he was acting within his legal rights.

After the departure of the officer, the keeper having the key and charge of the store, it was kept open for trade. Customers came in, to whom some of the attached merchandise was sold by the keeper, and some also by the plaintiff, but only by permission of the keeper. The keeper took and kept the money obtained from all sales so made, as well as the $9.00 or $10.00 that was in the cash register before the property was attached. Glovsky took possession of the merchandise he had purchased and paid its purchase price to Fogg, the keeper. In about half an hour after the Deputy Sheriff left, during which time these sales, as stated, had been made to the customers, the plaintiff left the store to seek the advice of an attorney and did not return that night. About ten o'clock that evening, the officer returned the key to him but neither the officer nor the keeper returned or offered to return any of the money received as above stated, nor was the plaintiff informed as to the amount retained.

Principles pertinent to abuse of process have lately been enunciated by this Court. To sustain such an action, "these two elements are essential: (1) the existence of an ulterior motive, and (2) an act in the use of process other than such as would be proper in the regular prosecution of the charge. The first of these elements may, perhaps, be inferred from the second, but existence of the first can not, in reason, dispense with proof of the second; for if the act of the prosecutor be in itself regular, the motive, ulterior or otherwise, is immaterial. . . . The test is, probably, whether the process has been used to accomplish some unlawful end, or to compel the defendant to do some collateral thing which he could not legally be compelled to do." *Lambert* v. *Breton*, 127 Me., 510, 514, 144 A., 864, 866; *Bourisk* v. *Lumber Company*, 130 Me., 376, 156 A., 382; 1 Cooley on Torts (3rd Ed.), 355, 356; *Spear* v. *Pendill* (Mich.), 130 N. W., 343; 1 R. C. L., 103, Sec. 4.

The plaintiff in this action sues not for malicious use but for malicious abuse of process. They are distinguishable. 1 R. C. L., 102, Sec. 2. "The fundamental distinction between malicious use and malicious abuse of process is that the first is an employment of process for its ostensible purpose, although without probable cause, whereas the second is employment of process for a purpose not contemplated by law. Another distinction is that, in the case of

malicious use, it must be shown that the action in which the process was used has terminated favorably to the plaintiff, whereas this is unnecessary in an action for malicious abuse." Sec. 373, 50 C. J., page 612, and cases cited.

In an action for abuse of process "the gist of tort or wrong consists in the unlawful use of a lawful process. The bad intent must culminate in an actual abuse of the process by perverting it to a use to obtain a result which the process was not intended by law to effect. . . . Regular use of process can not constitute abuse, even though the user was actuated by a wrongful motive, purpose or intent." Sec. 376, 50 C. J., pages 614 and 615; *Wood* v. *Graves*, 144 Mass., 365, 11 N. E., 567; Cooley, supra; *Spear* v. *Pendill*, supra; *Glidewell* v. *Murray-Lacy & Co., et al.*, 98 S. E., 665; 4 A. L. R., 225.

Validity of the process is no defense to an action for its abuse. *Glidewell* v. *Murray-Lacy & Co., et al.*, supra; Sec. 379, 50 C. J., page 617. But good faith is a defense in such an action. *Williams* v. *Eastman*, 208 Mass., 579.

All persons who knowingly participate in the abuse of process are liable for damages caused thereby *&c.* but a plaintiff in a process who does not direct or participate in abuse of the process by the officer and does not ratify his acts is not liable. Sec. 383, 50 C. J., page 618; *Wood* v. *Graves*, supra; 1 R. C. L., 109, Sec. 14.

We come, then, to apply the law, and particularly that stated in *Lambert* v. *Breton*, supra, to the facts in this case and thus will we examine, then, to discover whether there was "any ulterior motive," and, further, if there were "any acts in the use of the process other than such as would be proper" in its regular prosecution.

What was done with this process and by whom? The Deputy Sheriff was the agent of these defendants. They were personally present and directed his conduct.

First: Was the attachment excessive? Commanded to attach to the value of $70.00, property in value from $1000.00 to $1200.00 was attached. We are not unaware that our Court, in *Devereaux Company* v. *Silsby*, 120 Me., 362, on page 365, stated: "This Court has frequently held that attachments less or exceeding the directions in the precept do not render the officer serving the pre-

cept liable for an abuse of process where he acted in good faith and in the exercise of a sound discretion," or that in *Jensen* v. *Cannell,* 106 Me., 445, on page 447, 76 A., 914-915, this Court stated: "Generally an officer is not liable for attaching too much or too little property, if he exercises a sound discretion and acts in good faith." Also see *Williams* v. *Eastman,* supra. We hold that this jury was justified in finding in this case that neither sound discretion nor good faith was exercised.

Good faith and sound discretion required the attachment of at most not more than one tenth of this property. Only so much property attached, it might have been easily separated and removed by the officer, the plaintiff left in possession of his store and his conduct of it not otherwise interfered with. The attachment was grossly excessive.

Second: The appointment of a keeper was unnecessary and can not be justified. As it was an improper use of this process, whose *ad damnum* was only $70.00, to attach all of the stock and fixtures, so it necessarily follows that it was equally improper to appoint Fogg to keep it. One can not justify the appointment of a keeper of property wrongfully attached.

Third: The plaintiff's only key to the store was taken from him. True, he was not forcibly ejected. He was not locked out until later in the evening, when the keeper went from the store and locked the door. Still, the officer's taking of the key and consequent possession of the store deprived the plaintiff of his right to conduct and carry on his own business. If he would have been justified in attaching only a portion of the stock of merchandise and fixtures, then the remainder not attached could not lawfully have been separated from the plaintiff by lock and key, unless by his consent. The locking up of this store, without consent of the plaintiff, was clearly an abuse of this process.

Fourth: The keeper, if he could be said to be rightfully appointed as keeper, instead of keeping all of the property attached, sold some of it and converted it into cash. Our statute authorizing the attachment of personal property provides: "All goods and chattels may be attached and held as security to satisfy the judgment." R. S., 1930, Sec. 24, Chap. 95.

Prior to sale on execution, personal property attached can be sold only "by consent of the debtor and creditor." R. S., 1930, Sec. 31, Chap. 95, (and here consent by the debtor is lacking) ; or when "liable to perish, be wasted, greatly reduced in value by keeping, or be kept at great expense" such property, before sale on execution, may be sold by the attaching officer, without consent of the parties. R. S. 1930, Sec. 32, Chap. 95.

The sale of this property finds justification neither in the statute nor other sound principle of law. Such conduct was clearly without authority and improper use of this process.

Furthermore, the attachment was discharged when the officer returned the key to the plaintiff. "When the keeper abandons the possession, the attachment is dissolved." *Wheeler* v. *Nichols*, 32 Me., 233, 240; *Gower* v. *Stevens*, 19 Me., 92; *Brown* v. *Howard*, 86 Me., 342, 344, 29 A., 1094. The subsequent retention of the money taken was tortious and actionable.

Thus the defendants, by their own and their agent's acts, exceeded the authority of the process in these several respects, and, exceeding its authority, became trespassers *ab initio. Knight* v. *Herrin*, 48 Me., 533.

"An officer who attaches property on mesne process and sells it thereon, without the consent of the creditor and owner, or otherwise than by the mode prescribed in the statute, becomes a trespasser *ab initio." Ross* v. *Philbrick*, 39 Me., 29.

"When entry, authority or license is given to any one by the law, and he doth abuse it, he shall be a trespasser *ab initio.* Or in other words, 'where the law has given an authority, it is reasonable, that it should make void everything done by an abuse of that authority, and leave the abuser, as if he had done everything without authority.' Bacon's Abr. Trespass, B." *Ross* v. *Philbrick*, supra, at page 31; *Boston & Maine Railroad* v. *Small*, 85 Me., 462, 465, 27 A., 349.

Improper acts alone, however, in the use of process are not enough to establish liability for abuse of process. Such acts must be accompanied by "the existence of an ulterior motive." *Lambert* v. *Breton*, supra. Was there such here? The motive may be inferred from the improper acts, as stated in the case last cited. Here there is no necessity to resort to inference, for there is abundance of

direct testimony to show that these defendants had an actual intent to make an improper use of this process. The jury could well believe, and no doubt did, that the real purpose of these defendants was not to cause this property to be attached and to be "held as security to satisfy the judgment" that might be obtained, but, adopting the Deputy Sheriff's sworn statement as to what these defendants said in the law office, "to attach the store, . . . put in a keeper, and take what money they could get and then get out." Thus, the ulterior motive appears, not inferentially but as actually declared by the defendants themselves. When advised by the attorney, whose conduct is to be commended, that he considered such action illegal, in spite of that advice, they persisted in making such improper use of this process. It is perfectly apparent that at the time of the taking out of the process, if not before then, this unlawful plan or scheme was concocted and determined upon. Cunning and deception attended its execution. No Court of Justice should countenance it. Ample evidence there was to justify the verdict of the jury on the question of liability.

## Damages

"Damages recoverable for abuse of process are compensatory for the actual results of the wrong and may include recompense for physical or mental injury, expenses, loss of time and injury to business, property, or financial standing." Sec. 392, 50 C. J., page 621; *McGann* v. *Allen*, 105 Conn., 177, 184, 134 Atl. 810; *Malone* v. *Belcher*, 216 Mass., 209, 103 N. E., 637; *Barnett* v. *Reed*, 51 Pa., 190, 88 Am. Dec., 574.

We have no knowledge as to the way in which the jury arrived at the $250.00 declared in its verdict. Although the only specific item of compensatory damage was the money taken and not returned, yet the jury had the right, if it found the facts would warrant, to allow the plaintiff reasonable compensation for some of the other elements above enumerated.

Besides compensatory damages, "actual damage having been proved, the jury were justified in adding punitive damages. 'Acts wilfully and designedly done which are unlawful are malicious in respect to those to whom they are injurious.' *Page* v. *Cushing*, 38

Me., 528"; *Bourisk* v. *Lumber Company*, 130 Me., 376, 378, 156 A., 382, 383. It has not been made to appear that the damages assessed by the jury are excessive so as to warrant a new trial.

*Motion overruled.*